NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0137n.06
Filed: February 22, 2005

No. 03-6635

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CONOPCO, INC., D/B/A SLIM-FAST FOODS CO., | ) | |
| | ) | |
| *Plaintiff-Appellant*, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Western |
| ALLEN & HOSHALL, INC., | ) | District of Tennessee |
| | ) | |
| *Defendant-Appellee*. | ) | |

**Before:** **BOGGS, Chief Judge; MARTIN, Circuit Judge; and WEBER, District Judge.**[*]

**PER CURIAM**. Plaintiff-Appellant Conopco Incorporated ("Slim-Fast") appeals the district court order of summary judgment for the defendant, an architectural firm, on claims of breach of contract and professional negligence. Slim-Fast argues that summary judgment is inappropriate because the contract at issue is ambiguous and because a reasonable person could conclude the defendant violated its professional duty. For the reasons stated below, we affirm.

## I

This is a diversity case about the construction of a floor in Slim-Fast's warehouse in Covington, Tennessee. Slim-Fast hired Allen & Hoshall ("A&H"), an architectural firm, to design

---

[*]The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

the warehouse, including the floor. Slim-Fast wanted a white concrete floor in the warehouse. A&H submitted a design for the warehouse, including the floor, on December 12, 1997. Pursuant to Tennessee law, Tenn. Code Ann. § 62-2-306, A&H submitted its design under the firm's seal. That design was used to solicit bids from contractors. Linkous Construction Company ("Linkous") was then selected to serve as the contractor.

Before construction began, Slim-Fast rejected A&H's floor design. Not just any floor would do; Slim-Fast wanted a white floor. Slim-Fast first asked A&H to develop a concrete mix that would make the floor white, but A&H declined because of a lack of expertise with concrete mixes. Then, in the summer of 1998, Slim-Fast retained William B. Allen of Allen & Associates ("Allen") to develop another design for the floor. On October 7, 1998, Slim-Fast directed Linkous to build the floor in accordance with Allen's design. On October 8, 1998, Allen formally submitted a floor design with several modifications to the original A&H design. Specifically, Allen recommended 1) elimination of wire mesh reinforcement, 2) using dowels at all construction and control joints, and 3) using Eucosil to cure the concrete. Before the floor was poured, A&H was asked by Slim-Fast to approve the new floor design. Again, A&H declined because of a lack of expertise with "slag" (the mixed concrete employed here to make the floor white).

Linkous poured the concrete for the floor on October 19-21, 1998. On November 10, 1998, A&H submitted to Slim-Fast Amendment 1 (the "Amendment"). The Amendment was drafted by Allen and incorporated all the changes Allen had recommended. It is not disputed that A&H had no part in the design alterations in the Amendment. No seal was included in the Amendment, and the documents indicate that the floor design was done by Allen.

The floor proved defective. Slim-Fast claims that the design and construction of the floor was improper, which led to the "curling" of the slabs in the warehouse floor. Slim-Fast's experts have identified four potential causes: 1) the use of Eucosil to cure the concrete, 2) the failure of Linkous to install dowels in the control joints, 3) the use of a vapor barrier, and 4) the elimination of the wire mesh reinforcement.

Slim-Fast sued A&H for breach of contract and professional negligence.[1] On August 21, 2003, the district court resolved cross summary judgment motions by holding for the defendant on all claims. Slim-Fast's breach of contract claim had two components: first, liability for the defective floor design; second, liability for the failure of the contractor to construct the floor in accordance with the design. The district court concluded that A&H was not liable for the floor design in light of Slim-Fast's undisputed rejection of A&H's design and solicitation of a replacement design from Allen. The court further concluded that A&H was under no contractual obligation to inspect or supervise the construction of the warehouse. Finally, the district court concluded that the professional negligence claim simply duplicated the breach of contract claim for faulty design, and that the defendant could not be liable for professional negligence for alleged omissions that were not within A&H's contractual duties.

## II

We review a grant of summary judgment motion *de novo*, taking all facts in the light most

---

[1]Both Linkous and Euclid Chemical Company (the maker of the Eucosil curing agent) were originally named as co-defendants, but both settled before the summary judgment motion was filed.

favorable to the non-moving party. *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 543-44 (6th Cir. 2003).

It is not disputed that Tennessee law governs. In diversity cases, we apply the choice of law doctrine of the state in which the district court sits. *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998). The contract specifies that Tennessee law governs. Tennessee will honor such choice of law provisions if it shows a reasonable relationship to the transaction, unless it violates the public policy of the forum state. Tenn. Code Ann. § 47-1-105; *Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 27 (Tenn. Ct. App. 1993). For tort claims, including the professional negligence claim in this case, Tennessee applies a "most significant relationship" test. *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992). The events at issue – including the formation of the contract, the floor designing, and the construction – all took place in Tennessee. This satisfies the "most significant relationship" tort law test and "reasonably related to the transaction" contract law test.

**A**

"The cardinal rule for interpretation of contracts is to ascertain the intention of the parties from the contract as a whole and to give effect to that intention consistent with legal principles." *Sherman v. Am. Water Heater Co., Inc.*, 50 S.W.3d 455, 457-58 (Tenn. Ct. App. 2001). "[A] contract's provisions must be interpreted in the context of the entire contract, viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illustrate another." *D & E Const. Co., Inc. v. Robert J. Denley Co., Inc.*, 38 S.W.3d 513, 519 (Tenn. 2001) (citations omitted). Whether a contract is ambiguous is a question of law for the court. *Bratton v. Bratton*, 136 S.W.3d 595, 601 (Tenn. 2004).

A&H's basic duties under the contract are set out in Article 2, under the title "Basic

Services." The principal duty is to provide "Construction Documents" that set out the requirements for construction and are suitable for bidding. Slim-Fast no longer argues that A&H violated this basic duty. Instead, it claims that an ambiguity in Article 3, titled "Additional Services," permits the construction that the contract required A&H to insure that Allen's floor design was sound.

Slim-Fast argues that the "Contingent Additional Services" provisions in Paragraph 3.3 and the notice requirement in Paragraph 3.1.1 could reasonably be construed to impose liability on A&H. Paragraph 3.1.1 states: "If services described under Contingent Additional Services in Paragraph 3.3 are required due to circumstances beyond the Architect's control, the Architect shall notify the Owner prior to commencing such services." Slim-Fast argues that these provisions, which appear in Paragraph 3.3, required A&H to insure Allen's floor design was sound:

> 3.3.1 Making revisions in the Drawings, Specifications, or other documents when such revisions are:
>
> > 1. inconsistent with approvals or instructions previously given by the Owner, including revisions made necessary by adjustments in the Owner's program or Project budget.
> > . . . .
> 3.3.2. Providing services required because of significant changes in the Project including, but not limited to, size, quality, complexity, the Owner's schedule, or the method of bidding or negotiating an contracting for construction[.]

Slim-Fast argues that these provisions could reasonably have covered the floor redesign by Allen, and hence obligated A&H to take responsibility for changes in the design, or at least provide written notice to Slim-Fast that it was necessary to provide "Contingent Additional Services."

On their face, these provisions did not require A&H to insure that Allen's floor design was sound. The Contingent Additional Services provisions clearly function to insure the architect is

compensated if it performs additional duties, and that it first notify the Owner (Slim-Fast) before performing such duties requiring compensation. The language that triggers the Contingent Additional Services in paragraph 3.1.1 is: "[if these services] *are required* due to circumstances beyond the Architect's control." (emphasis added). The sum of A&H's duty was to provide an appropriate set of designs for the warehouse. Slim-Fast's decision to hire another architect for floor design is not a circumstance that "required" additional services by A&H because nothing in the contract obligates A&H to approve, supervise, or review third-party work. Therefore the Contingent Additional Services provisions never came into play.

Equally problematic for Slim-Fast is that the contract does have a provision that specifically identifies work with separate parties as "Optional Additional Services." Optional Additional Services are discretionary services that the Owner (Slim-Fast) may purchase separately by making a written request. Among them is paragraph 3.4.9: "Providing services in connection with the work of a construction manager or separate consultants retained by the Owner." This provision only makes senses if working with third parties, like Allen, is not among the duties A&H must perform or might have performed under other sections of the contract. Because there is no contention the Owner (Slim-Fast) requested, in writing under paragraph 3.4.9, that A&H perform additional services with "separate consultants," summary judgment is proper on the breach of contract claim.

**B**

Tennessee law requires architects to affix their seal to all plans prepared by them or under their charge. Tenn. Code Ann. § 62-2-306. The statute also prohibits architects from putting their seal on work they did not produce or oversee. The original plans issued on December 12, 1997,

were issued under A&H's seal.  The Amendment  – which incorporated Allen's new floor design – was issued by A&H on November 10, 1998, but the Amendment indicates that the new design was done by Allen.  The Amendment was not under A&H's seal – the only sealed document ever issued by A&H with respect to this project was the December 12, 1997, original plan.  Slim-Fast argues that the Amendment was somehow incorporated into the original document in such a fashion that it was also under the seal that applied to the original plans. It claims that because the plans were issued under seal, any defects in them are professional negligence even if A&H was not contractually responsible.

Slim-Fast's argument is without merit.  This tort argument suffers from two fatal defects even if we accept, *arguendo*, the dubious theory that the Appendix was somehow under seal because the original plans were under seal.[2]  First, there is an obvious causation problem: the Appendix could not have resulted in the defective floor because it was issued after the floor was built.  The Appendix was issued in November 1998, a month after the warehouse floor was poured in October 1998.  It is undisputed that the Appendix was to update the designs *after construction*, so Slim-Fast would have a copy of "as built" specifications.  On this ground alone, we need not consider this theory any further.

Second there is no basis for the claim that issuing plans under seal creates liability for professional negligence.  Slim-Fast cites no authority for the proposition that tort liability can result

---

[2]Slim-Fast cites no authority for the proposition that an Appendix or a revision to a plan that is clearly not the work of the architect can be considered under seal merely because the original plan is under seal.  When the designs in the Appendix are clearly the work of another architect, this is a counter-intuitive proposition, to say the least.

from the misplacement of a seal (or any placement of a seal whatsoever). There is nothing in the language of the statute or case law to support the idea that misapplication of a seal can create an additional professional duty apart from contract. The plaintiff asserts that Tennessee law imposes "certain duties on architects with respect to plans issued under their seal," but has no citation for this proposition, and has no clear legal argument to support it (other than a true, but irrelevant, argument about how the statute is intended to safeguard health and promote the public welfare). The statute requires architects to affix their seal to their plans, and prohibits them from affixing it to plans they did not produce. The only cases citing the seal statute are suits between architects and the Tennessee licensing board over the suspension or revocation of an architect's license to practice. *See*, *e.g.*, *Wamp v. Tennessee State Bd. of Architectural and Engineering Examiners*, 868 S.W.2d 273 (Tenn. 1993). The only remedy we have been able to find for misapplication of a seal is administrative, through an action by the licensing board. *See ibid*. At bottom, Slim-Fast is asking us to create a common law doctrine to buttress a public policy arguably expressed in the statute. For obvious reasons, we decline.

### III

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment for the defendant.